THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS SANTIAGO, Appellant.

First Department, November 2, 1978

356

### APPEARANCES OF COUNSEL

*Erica Horwitz* of counsel *(Martin Erdmann* and *William E. Hellerstein,* attorneys), for appellant.

*Vivian Berger* of counsel *(Robert M. Pitler* with her on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

This case brings before us once again the nettlesome problem of determining the limits of permissible police conduct in a street encounter.

At 9:30 P.M. on December 15, 1972 two police officers on duty in an anticrime assignment observed defendant Santiago standing alone on the corner of East 81st Street and Third Avenue. It was raining and the temperature was in the 30's.* Santiago appeared to the officers to be watching customers coming in and out of a liquor store. The store was located about 10 feet away from where Santiago was standing. As the officers kept a surveillance on Santiago they saw him engage in a one or two minute conversation with a man who had approached him, and then walked away. One of the officers followed the man for half a block and then returned to 81st Street.

---

\* There was no testimony in the proceedings below about weather conditions on the night in question. We are asked to and do take judicial notice of the weather. (See *Hunter v New York, Ontario & Western R. R. Co.,* 116 NY 615.)

The officers' surveillance lasted for about 20 minutes. For all but about five minutes Santiago remained standing on the corner. The only time he left was when he walked north one block to 82nd Street and Third Avenue. From that vantage point the liquor store would apparently be out of view, since it was on 81st Street. Santiago remained briefly at the corner of 82nd Street, perhaps five minutes, after which he returned to 81st Street and Third Avenue, where he entered a phone booth.

Acting on the belief that Santiago was "casing" the liquor store or its patrons the officers then approached the booth. Santiago was holding the telephone receiver in one hand. His other hand was in his right coat pocket. The officers identified themselves. One of them displayed his shield. Santiago was ordered to take his hand out of his pocket, but he remained in the same position, with the phone still to his ear. A second order was not given.

Contradiction in the officers' testimony develops at this juncture. One officer testified that he "patted" Santiago's coat below the pocket and by the thigh. When he felt something "harder than the hand" the officer grabbed the coat, slid his hand down to Santiago's waist, and pulled the coat open, revealing a sawed-off rifle.

The second officer testified that he grabbed Santiago's arm. When this officer attempted to pull the arm out of the pocket, the bottom of Santiago's coat moved, at which time his partner shouted that there was something under the coat.

Neither officer testified that he feared for his physical safety, nor that he noticed any bulge in Santiago's clothing before patting him down, or grabbing his arm, as the case may be. The rifle was seized.

After being placed under arrest and given the *Miranda* warnings, Santiago, according to the officers, said that he "was there to rip off the broad in a white car, or white broad in a car, for two keys." This statement was repeated again later at the precinct.

On the basis of these facts, Trial Term denied the motion to suppress the rifle along with Santiago's statements made subsequent to his arrest because: "The formation of suspicion must be based entirely on totally objective criteria. The element of experience of the person who is making the judgment must be an element and based upon that, I find it to have

been sufficient to have committed what I would characterize as stop and frisk in the circumstances."

After his motion to suppress was denied, Santiago pleaded guilty to attempted possession of a weapon as a felony (Penal Law, former §§ 110.00, 265.05) and was sentenced thereupon to probation. "[A] police officer, in the absence of any concrete indication of criminality, may approach a private citizen on the street for the purpose of requesting information" if he has "some articulable reason sufficient to justify the * * * action". *(People v De Bour,* 40 NY2d 210, 213.) "The basis for this inquiry need not rest on any indication of criminal activity on the part of the person of whom the inquiry is made". *(De Bour, supra,* p 213.) The stop must not be "the product of mere whim, caprice or idle curiosity." *(People v Ingle,* 36 NY2d 413, 420.)

In *People v La Pene* (40 NY2d 210), a companion case of *People v De Bour (supra),* the Court of Appeals enunciated a sliding scale of justifiable police intrusion, short of probable cause to arrest, which correlated the allowable intensity of police conduct to the nature and weight of the facts precipitating intrusion. The court specified three distinct levels of intrusion. The first level, already discussed, is the right to approach for the purpose of requesting information. The second, and more intense level of intrusion is the police officer's common-law right to inquire. This stage "is activated by a founded suspicion that criminal activity is afoot" *(People v De Bour,* 40 NY2d 210, 223, *supra)* and carries with it the right to interfere with a citizen to the extent necessary, short of a forcible seizure, to obtain an explanation. *(People v De Bour, supra,* p 223; *People v Cantor,* 36 NY2d 106, 114.) The third level, sanctioned in *People v La Pene (supra),* encompasses the statutory right provided by CPL 140.50 (subd 1) authorizing a forcible stop and detention of a person when a police officer entertains a reasonable suspicion that the person has committed, is committing, or is about to commit a felony or misdemeanor. As a corollary to the statutory right to detain, an officer also has the statutory authority to frisk if he reasonably suspects himself to be physically endangered. (CPL 140.50, subd 3.)

In order to determine the legality of the police officers' conduct we must first consider whether their action was justified in its inception, and then whether their conduct was reasonably related in scope to the circumstances which ren-

dered its initiation permissible. (See *People v Cantor, supra,* p 111; *People v De Bour, supra,* p 222.)

■ Of course, while a suspicion of criminal activity is not necessary to justify the stop of a citizen by a police officer—he may approach to request information if he has an articulable reason to justify such action—justification for the police officers' action here is not sought on the basis of a request for information but rather on the ground of reasonable suspicion that Santiago was about to commit a robbery. Thus, the reasonableness of their actions must be judged not by whether they can articulate a reason for their approach, but rather by whether they can demonstrate a foundation for their suspicion that criminal activity was afoot. Such a belief, if warranted, would activate, at the least, the second level of justifiable intrusion, the right to detain, to the extent necessary to obtain explanatory information.

In testing the *bona fides* of "a founded suspicion" of criminal activity, it should be borne in mind that "[m]ere 'hunch' or 'gut reaction' will not do." *(People v Sobotker,* 43 NY2d 559, 564.) It has been held that a sincere, good faith belief by police officers that a crime is about to be committed, without objective evidence of criminal activity, is insufficient to support the reasonable suspicion standard. *(Terry v Ohio,* 392 US 1, 22; *People v Sobotker, supra,* p 564; *People v Cantor,* 36 NY2d 106, 113, *supra.)*

■ ■ Viewed objectively, even from the perspective of a street-wise police officer, Santiago's behavior, at the time the officers confronted him at the phone booth, had been, to say the least, innocuous and was, at worst, equivocal. While it may undoubtedly be argued that his conduct was not inconsistent with the possibility that he was indeed "casing" the liquor store, it was equally plausible that he was waiting for someone. Whatever curiosity or suspicion Santiago's actions might have aroused was hardly heightened by his entry into the telephone booth. We are asked to interpret this as the call to a confederate. It could also be the innocent reaction of a person who, impatient with the tardiness of a friend, was calling to ascertain that person's whereabouts.

We conclude, therefore, that Santiago's conduct could not generate a founded suspicion that a crime was at hand. *(People v De Bour,* 40 NY2d 210, 216, *supra.)* Not only was each of his earlier acts consistent with innocent behavior, but we find that the entire sequence was devoid of any element of

objective evidence to justify the officers' suspicions. (For instance, there was no anonymous telephone call alerting the police to a planned robbery.)

■ Even assuming, *arguendo,* that the officers were acting on more than mere hunch, their subsequent actions were constitutionally impermissible. The legality of the initial stop does not justify every subsequent police act if, as noted earlier, the extent of the intrusion is not "reasonably related in scope to the circumstances which rendered its initiation permissible." *(People v Cantor,* 36 NY2d 106, 111, *supra.)*

■ Since the common-law right to inquire does not permit seizures, but only entitles the police to ask questions, the police action here must find statutory support or be deemed unlawful. *(People v De Bour, supra,* p 223; *People v Cantor, supra,* p 111.) Under CPL 140.50 (subd 1), a reasonable suspicion of criminal activity only permits a police officer to demand a person's name, address and an explanation of his conduct. A search is not authorized unless the officer "reasonably suspects" that he is in danger of physical harm. (CPL 140.50, subd 3.)

Before an officer "places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *(People v Sibron,* 392 US 40, 64; *People v Stewart,* 41 NY2d 65, 69; see, also, *People v Sterling,* 63 AD2d 210.)* Here, neither officer testified that he feared Santiago was armed or dangerous. Nor do the facts suggest that such a belief would have been reasonable under the circumstances. Indeed, our courts have held that the mere placement of one's hand in one's pocket does not create a suspicion that an indivdual is armed. *(People v Prachilo,* 41 NY2d 759, 762-763; see, also, *People v Batino,* 48 AD2d 619.) Neither officer felt compelled to place his hands on his gun for protection. The officers simply approached Santiago, ordered him to take his hand out of his pocket, and, when he failed to respond, seized his arm and frisked him. The order was never repeated; no further inquiries were made. It may well be that Santiago, still engaged in a telephone conversation, did not hear the officers' order. In such circumstances, the seizure cannot be defended, either under statute or case law.

■ Though their suppression is not essential to the ultimate

disposition, Santiago's postarrest statements, preceded by the *Miranda* warnings, were rendered constitutionally infirm by the illegality of the seizure and arrest. *(Brown v Illinois,* 422 US 590; *People v Stewart,* 41 NY2d 65, *supra.)* The fruits of an unconstitutional search should be suppressed.

Accordingly, the judgment of Supreme Court, New York County (ROSENBERGER, J.), rendered November 5, 1975, convicting defendant of attempted possession of a weapon, should be reversed, on the law, the motion to suppress granted, the plea vacated, and the indictment dismissed.

LUPIANO, J. (dissenting). On December 15, 1972, at about 9:30 P.M., Officer Gleeson and Detective Yorio, anticrime policemen, dressed in plain clothes, were proceeding north on Third Avenue in Manhattan in an unmarked vehicle driven by a third officer. At the northeast corner of Third Avenue and 81st Street, they noticed defendant, who was standing alone by a liquor store with a glass front and appeared to be watching customers enter and leave the store. Both officers exited the vehicle between 81st and 82nd Streets and began surveillance of defendant. They observed him for a total of approximately 20 minutes, during which time defendant engaged in a brief conversation with an unknown male, and also walked north on Third Avenue to 82nd Street where he remained for about five minutes, only to return again to the corner where the liquor store was located. Defendant then entered a phone booth and appeared to be making a call. Officer Gleeson testified that after waiting a minute or so, he and Detective Yorio approached defendant. Detective Yorio states that the approach was made some five minutes after defendant entered the booth.

In approaching defendant to initiate an inquiry, the officers, aware that defendant's conduct was equivocal, that is, it could be explained in terms of a legitimate motive or in terms of a criminal motive, were operating under the apprehension that defendant might be "casing" the liquor store or its patrons. Detective Yorio, who was walking ahead of Officer Gleeson, identified himself as a policeman, displayed his shield and stated to defendant that he wished to speak with him. As a precautionary step, in light of his expertise and the surveillance already engaged in, Detective Yorio asked defendant to take his right hand out of his pocket. Defendant's left hand was holding the phone. This reasonable request was necessitated by the fact that if indeed defendant was embarked upon

criminal activity, i.e., he was "casing" the liquor store or its patrons, the probability existed that he was armed. While defendant had the phone in his left hand, Detective Yorio *did not hear defendant speaking to anyone* and defendant did not comply with the detective's request to remove his hand from his pocket.

Detective Yorio testified: "I placed my hand on his arm. I went to pull his arm out of the pocket and in doing so, the bottom of the coat moved. It was a long maxi coat, I would say, below knee length, and as I moved his arm up, the bottom of the coat moved up and out, at which time Gleeson shouted to me, be careful, there's something under the coat."

Officer Gleeson testified that at this point he "notice[d] something in the coat." He then patted defendant's coat, felt a hard object, pulled the coat open and drew out a sawed-off rifle from beneath the lining, which was separated from the rest of the coat. Defendant was then placed under arrest and, after receiving *Miranda* warnings, made some statements to the effect that he was there to "rip off" a woman. On appeal, defendant contends that the Supreme Court incorrectly denied his motion to suppress the weapon and his statements.

As noted in *People v De Bour* (40 NY2d 210, 219): "Due to the tendency to submit to the badge and our belief that the right to be left alone is 'too precious to entrust to the discretion of those whose job is the detection of crime' *(McDonald v United States,* 335 US 451, 455), a policeman's right to request information while discharging his law enforcement duties will hinge on the manner and intensity of the interference, the gravity of the crime involved and the circumstances attending the encounter." The "tendency to submit to the badge" while characteristic of the law-abiding citizen is certainly not in evidence with respect to the criminal and those to whom freedom means the absolute and unlimited "right" to do what they would. The defendant herein evinced no tendency to submit to Detective Yorio's badge and refused the request merely to remove his hand from his pocket. *People v De Bour (supra)* delineates a reasoned and commonsense approach to the problem of analyzing what constitutes proper police conduct in the uncovering of criminal activity respecting an intrusion in street encounters upon the freedom of the citizen. It is well to set that analysis forth *(People v De Bour,* 40 NY2d 210, 222-223, *supra):* "In evaluating the police action we must consider whether or not it was justified in its inception

and whether or not it was reasonably related in scope to the circumstances which rendered its initiation permissible *(People v Cantor,* 36 NY2d 106, 111). We bear in mind that any inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions. By this approach various intensities of police action are justifiable *as the precipitating and attendant factors increase in weight and competence.* The *minimal* intrusion of approaching to request information is permissible when there is some objective credible reason for that interference *not necessarily* indicative of criminality" (emphasis supplied).

The police did not exhibit hasty conduct here; they approached defendant simply to request information which would illuminate the nature of defendant's activity only after they had observed his actions on an inclement winter's night for some 20 minutes. Their conduct in initiating an inquiry was clearly consonant with *De Bour.*

To continue with the analysis outlined in *De Bour (supra,* p 223): "The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure [citations]. Where a police officer entertains a *reasonable suspicion* that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person (CPL 140.50, subd 1; see *Terry v Ohio,* 392 US 1; *People v Cantor, supra).* A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)." (Emphasis supplied.)

The merit of the foregoing analysis lies in its recognition of the dynamic aspect of street encounters between the police and the private citizen. Clearly, the role of the police is not limited to the apprehension of the criminal after a crime has been perpetrated, but extends to the frustration of the crime itself. In light of defendant's highly equivocal conduct, observed during the course of a sustained 20-minute surveillance, the police would have been remiss in not investigating as that conduct could well serve as a predicate for a suspicion or belief that defendant was up to no good. As noted by the

Court of Appeals in *People v Rivera* (14 NY2d 441, 444-445, cert den 379 US 978): "The business of the police is to prevent crime if they can. Prompt inquiry into suspicious or unusual street action is an indispensable police power in the orderly government of large urban communities. It is a prime function of city police to be alert to things going wrong in the streets; if they were to be denied the right of such summary inquiry, a normal power and a necessary duty would be closed off."

The critical factors are whether it was proper for the police to ask defendant to remove his hand from his pocket under the circumstances herein and whether, in consequence of noncompliance, the detective could physically attempt to secure compliance by the limited intrusion of pulling defendant's arm.

Jurists are not compelled to imitate the ostrich with its reputed penchant for sticking its head in the sand when faced with a precarious situation. Statistics as to the use of handguns in the perpetration of robberies of liquor stores and of the citizenry at large lend convincing credence to the reasonableness of the request by Detective Yorio to defendant to remove his hand from his pocket. A person holding his hand in his pocket, who has already acted equivocally enough to attract the attention of the police in the reasonable discharge of their duties, may well be, under the particular circumstances of the street encounter, concealing a gun or some other dangerous instrument that might be utilized against the police.

A law-abiding citizen approached by the police under the circumstances herein as remarked upon by the Court of Appeals in *People v De Bour* (40 NY2d 210, 219, *supra)* would have exhibited "the tendency to submit to the badge" and complied with what is patently a limited intrusion of his "right" to be left alone, namely, the request to remove his hand from his pocket. The refusal by defendant to comply when viewed in the dynamics of this street encounter constituted a basis for the ensuing police conduct. The noncompliance in itself introduced a new factor into the unfolding drama and now served to forge another link in the chain of events—namely, an evasive act, one serving to give an articulate reason justifying the officers' fear for their safety and suspicion that criminal activity was afoot. Of some relevance is the succinct observation in *People v Stroller* (42 NY2d 1052,

1053), by the Court of Appeals: "When, upon inquiry by the police, the defendant gave an unintelligible, unresponsive reply, the officer could then make a limited pat down search in the nature of a frisk, not to discover evidence of a crime, but in order to *pursue his investigation without fear of violence* (see *People v Stewart,* 41 NY2d 65)." (Emphasis supplied.) The sign of peace and friendship from time immemorial has been the exposed hand, whether by way of handshake or raised up, palm outward, disclosing the absence of a weapon and thus, a friendly gesture.

Under the circumstances herein, the officers did not approach defendant with guns drawn or with their hands upon their own weapons. Beyond peradventure the ordinary citizen would feel less threatened by a request to remove his hand from his pocket by a police officer displaying a badge and giving notice that he wanted to ask a few questions than by an officer initiating such inquiry with gun drawn or with his hand on the gun. In asking defendant to remove his hand from his pocket, Detective Yorio chose the least restrictive alternative compatible with protecting himself and his fellow officer. Indeed, the natural order of events dictates that a law-abiding citizen under these circumstances would not even construe this request as a "petty indignity."

It is evident from scrutiny of the record herein that Officer Gleeson and Detective Yorio were worried about the danger that defendant was carrying a hidden weapon. Defendant's speculation that the officers laid hands on him because of irritation at his disobedience is purely gratuitous and finds no support in the record. Moreover, defendant's failure to obey the detective had increased the policemen's apprehension of danger to themselves since now the hand-in-pocket posture could no longer be viewed as merely accidental, but as one willed.

Beyond cavil, this case does not present a situation suggestive of police harassment, improper police motivation or precipitate police conduct. The police had proper grounds initially to approach defendant. Thereafter, his refusal to remove his hand from his coat pocket gave rise, together with the facts initially prompting inquiry, to reasonable suspicion that defendant was engaged in committing a crime and was armed and dangerous. The graduated response of Detective Yorio in pulling at defendant's arm constituted proper police conduct, that is, a further intrusion short of a physical seizure to

remove the element of danger. This action disclosed the presence of something concealed under defendant's coat and the escalating series of events blossomed into a situation fully justifying a forcible stop and detention. To reiterate: "A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)" *(People v De Bour,* 40 NY2d 210, 223, *supra).*

The perception by the citizenry of the functioning of the law enforcement system which entails the conduct of the police and of the criminal justice system which entails the dispensation of justice to those charged with crime is a potent factor in the morale and maintenance of a free and civilized society. A society which proclaims itself free but whose citizens rightly or wrongly believe the scales of justice most noticeably "favor" the criminal and ignore the plight of the victim and whose citizens increasingly retreat into isolation through fear that utilization of the public streets, transportation and facilities will expose them to criminal endeavors, is a society in retreat from freedom. The law is not static, but dynamic. However, the process of change is neutral and in *its* effects, insofar as controllable by man, is sometimes good and sometimes bad. Men make good laws as well as bad. The bad laws most noticeably result when there exists an unfettered, blind devotion to an ideal, an abstract absolute principle which ignores the reality of the individual person. If freedom is interpreted in an abstract absolute sense as the right to do what one wants, then no one is free. It is the interrelation of rights with their corresponding duties which preserves the dynamics of true freedom and this mandates the maintenance of a reasoned authority to maximize the true enjoyment of freedom by the individual. In our society we have placed the responsibility of maintaining a reasoned civil order in the first instance on the police. It is only fair, therefore, that we view the policeman as a real person, one imbued with the strengths and weaknesses of his or her fellow man, albeit one possessed of a certain expertise acquired by training and experience. Ensconced within the safety of our libraries, our courtrooms and our homes, we must not forget the reality that it is the police to whom we look for protection and for succor and whom we place in natural proximity to the criminal world as a line of defense. Entrusting the police officer with a gun, we

expect the faithful discharge of duty, even to the death. Yet, when the officer discharges that duty we sometimee, in examining the correctitude or reasonableness of that discharge, scrutinize the officer not as a real human being, but as an abstract, a myth, the perfectly rational man. This is a danger to be avoided.

Viewing Detective Yorio and Police Officer Gleeson as real human beings and mindful of the realities of the dangers posed to the police in the discharge of their duties, it must be concluded on this record that the conduct by the police was reasonable and did not constitute an overly intrusive act subversive of the freedom of a citizen.

Accordingly, the Supreme Court correctly denied defendant's motion to suppress the seized weapon and the statements uttered voluntarily by defendant. The judgment of the Supreme Court, New York County (ROSENBERGER, J., at suppression, plea and sentence), rendered March 5, 1975, convicting defendant on his plea of guilty of attempted possession of a weapon as a felony, should be affirmed.

MURPHY, P. J., and YESAWICH, J., concur with SULLIVAN, J.; KUPFERMAN and LUPIANO, JJ., dissent in an opinion by LUPIANO, J.

Judgment, Supreme Court, New York County, rendered on November 5, 1975, reversed, on the law, the motion to suppress granted, the plea vacated, and the indictment dismissed.