THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANDRE CHESTNUT, Appellant.

First Department, July 10, 1979

### APPEARANCES OF COUNSEL

*Judith Zerden* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Richard P. Kaye* of counsel *(Jerrold Tannenbaum* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

At issue is the propriety of the denial of defendant's motion to suppress physical evidence, and statements made by him contemporaneously with the seizure of a gun and at the station house after his arrest. Subsequent to the denial of his motion defendant entered a plea of guilty.

The following facts were adduced at the suppression hearing. On the evening of January 4, 1977, at 8:45 P.M. police officers Dieterich and Stryker, assigned to an anticrime unit, were in plainclothes in an unmarked taxi. Stryker was the operator. Driving south on West End Avenue, they observed a Black male and a white male and female huddled in apparent conversation in a phone booth at the corner of 64th Street. Their suspicions aroused, the officers made a U-turn and stopped at 63rd Street from which vantage point they observed the individuals for about one minute. The Black male, subsequently identified as Anthony Hernandez, left the booth and walked south to 63rd Street. As he walked away he was observed turning his head several times and looking over his

shoulder. Hernandez turned east onto 63rd Street, but returned to the corner and peeked back in the direction of the phone booth.

Dieterich left the taxi and followed Hernandez for a few steps on 63rd Street, and observed him enter a playground which was part of a housing project. Dieterich then returned to the taxi and the officers drove north on West End Avenue, made a right at 64th Street and drove east for a half block, stopping by the north side of the playground. Dieterich again got out of the taxi, this time to see if he could find the other male and female who had been seen earlier in the phone booth. Stryker, who had Hernandez under observation in the playground, saw him engaged in apparent conversation with the defendant Chestnut, and he observed Hernandez hand something to Chestnut. At about this time, Stryker received a radio transmission of a robbery at 64th Street and West End Avenue. The perpetrator was described as a young, Black male wearing a blue jacket and a black flop hat, and armed with a silver gun. Stryker called Dieterich back to the taxi and informed him of the radio report. The officers agreed that Hernandez fitted the description.

As the officers spoke they noticed Hernandez and Chestnut walking out of the playground towards the taxi. As they approached they looked at Dieterich and Stryker and then abruptly reversed direction and returned to the playground. Dieterich told Stryker to transmit an alarm that they were were following a possible suspect in the robbery and then followed the pair into the playground where they were joined by a female. The trio then walked from the playground through the housing project towards Amsterdam Avenue. Stryker drove around the corner to Amsterdam Avenue and exited the taxi. He attempted to contact his communications dispatcher on his portable radio, but failed to receive an acknowledgment. As he walked south along Amsterdam Avenue he observed Hernandez and Chestnut, accompanied by the female, walking out of the project in his direction. As the group approached, Stryker identified himself as a police officer, showed his shield and, with revolver drawn, shouted: "Police Officer, freeze. Don't move, lay down on the ground." Hernandez and Chestnut turned and saw Dieterich behind them, and then lay down. The female stepped aside. While they were on the ground Dieterich asked: "Where is the gun?" Chestnut answered "it's right here", and pointed to his right-

hand pocket. Dieterich reached into the pocket and removed a silver-plated revolver. Hernandez and Chestnut were then arrested and handcuffed.

Eventually, more police arrived, together with the complaining witnesses, who identified the revolver as the weapon used in the robbery. At the police station, after Chestnut had been given his *Miranda* warnings, he denied participation in any robbery but admitted ownership of the gun, and claimed that he had let Hernandez hold it.

A subsequent search of Chestnut at the station uncovered three manila envelopes of marihuana and two 5-dollar bills, which Chestnut admitted had been given to him by Hernandez. The complainants had reported that they each had a 5- and a 10-dollar bill taken from them. Two 10-dollar bills were found on Hernandez.

■ At the close of the hearing, the court found that the police officers had probable cause to arrest Hernandez and that the circumstances justified a frisk of Chestnut, and that no preliminary questions were required, since one of the officers had observed Hernandez pass an object of some type to Chestnut, and the officers were aware that a robbery had taken place. We agree.

One of the most vexing of judicial issues is the delineation of permissible police intrusion upon the liberty of the private citizen in a street encounter. Judges are called upon to balance "the legitimate interests of the defendants against the reasonableness and appropriateness of the police action." *(People v Prochilo,* 41 NY2d 759, 761.) Immutable legal abstracts, easily enunciated in an atmosphere conducive to research, reflection and deliberation are applied, less facilely, to the infinite vagaries of human activity, oft-times carried out in a caldron of emotion. The central figure in these confrontations and whose conduct it is that we are asked to judge is the police officer, who is faced with the daily possibility that any incident might become a life or death situation, with little or no time for reflection, let alone deliberation.

■ CPL 140.50 (subd 3) authorizes police officers to frisk an individual, whom they have stopped for an explanation of his conduct, if they reasonably suspect that they are in danger of physical injury. To justify a "self-protective search for weapons", an officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *(Sibron v New York,* 392 US 40, 64.)

Whether a police officer's conduct is reasonable "must necessarily turn on the facts in each individual case" *(People v Green,* 35 NY2d 193, 195), and is based on how justifiable his suspicions. It has been held that: "Reasonable suspicion is the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. [Citations omitted.] To justify such an intrusion, the police officer must indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice. [Citations omitted.] Nor will the good faith on the part of the police be enough to validate an illegal interference with an individual [citations omitted]." *(People v Cantor,* 36 NY2d 106, 112-113.)

The Court of Appeals has identified three preliminary areas of inquiry in the resolution of whether an officer's actions were reasonable in the conduct of a frisk which leads to the seizure of a gun: "Was there proof of a describable object or of describable conduct that provides a reasonable basis for the police officer's belief that the defendant had a gun in his possession? Was the manner of the officer's approach to the defendant and the seizure of the gun from him reasonable in the circumstances? Was there evidence of probative worth that there had been a pretext stop and frisk or that the police were otherwise motivated by improper or irrelevant purpose?" *(People v Prochilo,* 41 NY2d 759, 761-762, *supra.)* We are of the view that on the facts here the answers to these questions are compellingly in the police officers' favor.

As the officers approached Hernandez and Chestnut, they were aware that a gunpoint robbery had been committed and that Hernandez matched the description of the robber. Moreover, the officers themselves had seen Hernandez involved with two individuals at the intersection where the robbery reportedly occurred, and thus the officers had valid reasons to believe that the description of the robber was confirmed by their own continuing observation of Hernandez. Under such circumstances they quite clearly had probable cause to stop and arrest Hernandez. "Probable cause exists if the facts and circumstances known to the arresting officer warrant a prudent man in believing that the offense has been committed". *(People v Oden,* 36 NY2d 382, 384.)

Before the officers had reason to seize Hernandez, however, one of them had seen him pass an object to Chestnut.

While it might well be that the object was innocuous, as the dissent suggests, from the perspective of the police officer, there was a likelihood that the object passed was a gun, particularly since Hernandez, the robber, was less than a block from the crime scene and would have an interest in disgorging himself of the incriminating weapon.* To label as "sheer speculation" the inference that it was a gun that Hernandez passed to Chestnut is to ignore the reality of the situation. Even the most naive individual would be wary when he saw a suspected armed robber pass "something" to another individual minutes after the crime had been committed.

Furthermore, Officer Stryker, who gave the command to lie down, had also attempted, to no avail, to call his dispatcher. Hence, he was aware that in a situation where he wanted the security of reinforcements, he had only Dieterich to assist him. Since "we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty." (People v Rivera, 14 NY2d 441, 446.)

The situation confronting the officers was certainly an unusual street incident. They had reason to believe that they were coming face-to-face with a man wanted for armed robbery, and were confronted with the distinct possibility that his companion was now in possession of the gun. In People v Sterling (63 AD2d 210, 215), where the police had received a radio report of an armed robbery, and, after having approached a suspect, discovered that he had a gun, this court found that "the officers were endowed by statute with the authority to frisk [his companions in a car] so as to ensure that the result of their inquiry would not be a hail of bullets." We fail to see why Dieterich and Stryker should be deprived of the same self-protective right to frisk. Unsure as to who was in possession of the gun, the officers necessarily had to frisk Chestnut to assure their own safety.

The dissent argues that the order to Hernandez and Chestnut to lie on the ground was a seizure, and thus an arrest. But a seizure does not, ipso facto, constitute an arrest. (See Terry v Ohio, 392 US 1; Dunaway v New York, 442 US 200.) There is in any frisk the element of a seizure, since an individual's movement is curtailed and his person is subject to touching by

---

* That Hernandez was still apprehensive is evidenced by the fact that he turned back into the playground with Chestnut after seeing Dieterich and Stryker standing by the taxi.

other persons. But it requires more than an impairment of mobility to elevate a stop into an arrest. We are unaware of any statute or decisional authority that states that there is only one constitutionally acceptable manner of accomplishing a frisk. Some officers may simply pat down an individual while he is standing upright. Others may conduct the frisk with the detainee positioned against a wall or the side of a motor vehicle. And others may accomplish the frisk, like the officers here, by ordering a suspect to lie on the sidewalk. The nature of a frisk, as opposed to a search, is that it is essentially a pat down. The position of the suspect during the pat down does not convert the frisk into a search.

Although Dieterich denied that the confrontation was a stop and frisk, Stryker testified that Dieterich frisked both men, and Dieterich himself stated only that he asked where the gun was. The intrusion upon Chestnut's person was not inconsistent with classic stop and frisk procedure, no matter what label Dieterich gave to it. Dieterich's denial that the confrontation was a frisk does not make it a search. To hold otherwise would mean that what a policeman calls a good frisk, but which is in reality a bad search, would have to be sustained by his appellation, permitting a triumph of form over substance.

The dissent also suggests that the officers' approach with their guns drawn elevated immediately the order to lie down into an arrest situation. However, "the predicate established defines the scope of permissible police conduct." (*People v Stewart,* 41 NY2d 65, 66.) Here, it is clear that the officers were justified in drawing their guns as they approached two men, one of whom had just committed a gunpoint robbery. Consequently, of necessity, any commands the officers might subsequently give to Hernandez and those with him, or questions they would ask, would have to be at gunpoint. To hold that Chestnut was, *ipso facto,* arrested by the drawing of the gun would mean that anytime an officer draws his gun and gives an order, or perhaps just asks a question, all those to whom he is speaking would be under arrest. In an emergency situation an officer is unable to cull out those against whom reasonable force is necessary from the innocent bystander, or the individual, like Chestnut, whose conduct, although not meriting arrest, is certainly suspicious enough to warrant a frisk.

 Finally, we note that Chestnut's statement "it's right here" and his indication as to the gun's location, given in response to Dieterich's inquiry, "Where is the gun?", only hastened the inevitable. Had he said nothing, or the police asked nothing, the frisk for which the officers were positioning Hernandez and Chestnut on the ground would have produced the gun anyway. "[E]vidence obtained as a result of information derived from an unlawful search or other illegal police conduct is not inadmissible under the fruit of the poisonous tree doctrine where the normal course of police investigation would, in any case, even absent the illicit conduct, have inevitably led to such evidence." *(People v Fitzpatrick,* 32 NY2d 499, 506; see, also, *United States v Seohnlein,* 423 F2d 1051, cert den 399 US 913; *People v Reisman,* 29 NY2d 278; *People v Mendez,* 28 NY2d 94.) Thus any failure to inform Chestnut of his Fifth and Sixth Amendment rights before he answered does not impair the legality of the frisk and seizure of the gun. We do not believe, however, that the single question asked by Dieterich constituted an interrogation to which the *Miranda* warnings are applicable. (See *People v Huffman,* 41 NY2d 29, 33, 34.) Nevertheless, even if Chestnut's response to Dieterich's inquiry were suppressed, the plea should not be disturbed.

Accordingly, the judgment, Supreme Court, New York County (COON, J.), rendered September 6, 1977, convicting defendant, on his plea of guilty of criminal possession of a weapon in the third degree and sentencing him thereupon to a term of statutory probation, should be affirmed.

FEIN, J. (dissenting). Defendant appeals from a judgment convicting him on a plea of guilty to criminal possession of a weapon in the third degree and sentencing him to a term of five years' probation. The issue is the denial of defendant's motion to suppress both physical evidence and a statement made by him at the time of his arrest.

Officers Dieterich and Stryker, assigned to an anticrime patrol on the evening of January 4, 1977, were proceeding south on West End Avenue near 64th Street, in plainclothes, in an unmarked police taxicab. At about 8:45 P.M. they observed three persons, a Black male, subsequently identified as Anthony Hernandez, and a white male and white female engaged in conversation huddled in a phone booth at the corner of 64th Street and West End Avenue. The officers, after making a U-turn, observed Hernandez walk away from the

other two, heading south on West End Avenue toward 63rd Street. After reaching the corner he looked back over his shoulder, turned onto 63rd Street, and, after rounding the corner, came back to the corner looking back at the two people he had left at the phone booth. He then continued eastbound on 63rd Street. Officer Dieterich, his suspicions having been aroused by Hernandez' actions, left the taxi and followed Hernandez into the Amsterdam housing projects. Although Dieterich testified that he returned to the taxicab intending to go to the corner to talk to the white male and female who had been with Hernandez in the phone booth, he did not do so. When he returned to the taxicab, Officer Stryker told him that a report of a robbery at 64th Street and West End Avenue had just come over the radio and that Hernandez fitted the description of the robber, "a young male, Black, wearing a blue-type ski jacket, and * * * a flop hat, armed with a silver gun." The officers then observed Hernandez coming toward them from a schoolyard on to 64th Street. He was engaged in conversation with another Black male later identified as defendant Chestnut. The two men turned around and walked back into the schoolyard, Officer Dieterich proceeding on foot to keep both under observation. Before receipt of the radio run, Stryker had observed Hernandez hand something to Chestnut. Notably absent from Dieterich's testimony is reference to any similar observation. While Dieterich followed the two into the schoolyard, Stryker drove up 64th Street to Amsterdam Avenue. At some point Hernandez and Chestnut were joined by a woman, the three walking toward Amsterdam Avenue. Stryker, placing his police shield in his jacket pocket and taking his revolver from its holster and placing it in the waistband of his pants, proceeded south on Amsterdam Avenue. He observed Hernandez, Chestnut and the female coming toward him, with Dieterich about 20 feet behind. As the three approached, Stryker pulled his police shield out of his jacket pocket, and, holding it in his left hand, drew his revolver and shouted to them: "Police Officer, freeze. Don't move, lay face down on the ground." Hernandez and Chestnut lay face down on the ground while the female was directed by Stryker to stand near a fence. Although Stryker testified that Dieterich began to frisk Chestnut, Dieterich, to the contrary, testified at the suppression hearing that this was not a stop and frisk. He stated that he approached Chestnut as he lay on the ground and asked him: "Where is the gun?", to which Chestnut responded: "It's right here", pointing to his

right-hand pocket. Dieterich reached in the pocket and re-
moved a silver-plated revolver. Defendant and Hernandez
were arrested and taken to the police precinct, where *Miranda*
warnings were given.

I disagree with the majority in sustaining as proper the
actions of the police officers in seizing defendant at gunpoint.
No matter what degree of suspicion may have been evoked by
the actions of Hernandez, there was neither justification for
the seizure of defendant, nor probable cause for his arrest.
Clearly, where there is a search and seizure, the legality of
police conduct under the circumstances depends upon the
presence of probable cause *(Terry v Ohio,* 392 US 1; *Adams v
Williams,* 407 US 143). A seizure of a person occurs where
there is a significant interruption with an individual's liberty
of movement *(People v Cantor,* 36 NY2d 106, 111; *People v De
Bour,* 40 NY2d 210, 216). In *Cantor,* it was held that where
three plainclothes officers surrounded defendant with revolv-
ers drawn, blocking his vehicle with theirs, this constituted a
seizure which, under the facts in that case was found to be
unreasonable since "the investigative inquiry exceeded per-
missible bounds in its inception and scope. The police had no
reason to question this defendant and there was no justifica-
tion for surrounding him in a manner constituting a seizure."
*(People v Cantor, supra,* p 114.) The underlying rationale was
expressed by the Court of Appeals as follows: "Whenever an
individual is physically or constructively detained by virtue of
a significant interruption of his liberty of movement as a
result of police action, that individual has been seized within
the meaning of the Fourth Amendment *(Terry v. Ohio, supra).*
This is true whether a person submits to the authority of the
badge or whether he succumbs to force. Here the defendant
was deprived of his freedom of movement when he was
encircled by three police officers as he stood alongside his car
which was blocked by the police vehicle. At that moment he
could not have proceeded on his way, therefore he was seized."
*(People v Cantor, supra,* pp 111-112.)

When Stryker approached Hernandez, Chestnut and the
woman and, with his service revolver drawn, directed them to
freeze, ordering Hernandez and Chestnut to lie face down on
the ground and motioning the woman to stand up against the
fence, all three were effectively seized within the meaning of
the Federal and State Constitutions. To sustain as proper the
conduct of the police requires sufficient demonstration that
probable cause existed. Even assuming that such probable

cause existed to arrest Hernandez, since he matched the description received by the officers in the radio run, combined with the officers' observations of his suspicious behaviour in relation to the activities at the telephone booth, there was no proof in any way to implicate Chestnut in that robbery. At no point did the officers observe Chestnut at or near the telephone booth. It is undisputed that Chestnut met Hernandez after the robbery had occurred. The mere fact that he was with Hernandez at the time the officers approached is an insufficient basis to justify the seizure. "A person, otherwise acting innocently, may not be arrested merely because he was in the company of other individuals who had engaged in criminal activity." *(People v Griffith,* 63 AD2d 138, 142; *People v Martin,* 32 NY2d 123, 125; *People v Trapier,* 47 AD2d 481, 483.)

Nor may the propriety of the seizure be condoned by the observation of Officer Stryker that Hernandez handed something to Chestnut. There is no proof as to what passed between the two. The "something" referred to by Stryker could have been anything. To infer that it was the weapon used by the perpetrator in the robbery is sheer speculation without any foundation in the record. Moreover, Dieterich, who had been following Hernandez and who was apparently closer to him when he met Chestnut, did not testify to having seen Hernandez give anything to defendant. Nevertheless, it was Dieterich who approached Chestnut after Stryker had directed Chestnut at gunpoint to lie face down on the ground and inquired: "Where is the gun?" Assuming as true Stryker's observation that Hernandez handed something to Chestnut, in the absence of proof to establish that there was an exchange of a weapon, the observation of Stryker's supported by the alleged suspicious activity of Hernandez, would at best authorize further investigation and inquiry by the officers—an exercise of the common-law right to inquire, within the second level of police intrusive behavior authorized in *People v De Bour (supra).* The common-law right to inquire "is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, but short of forcible seizure" *(People v De Bour, supra,* p 223). Here, however, no attempt was made by the officers to conduct any inquiry or investigation insofar as Chestnut is concerned. Rather, the officers seized defendant at gunpoint without any justifiable basis to

support the extreme conduct employed. Clearly, the circumstances warranted a less intrusive approach by the arresting officers.

*People v Bronk* (31 NY2d 995, affg 66 Misc 2d 932) is instructive. There, the proof adduced at the suppression hearing through the arresting officer established that an unidentified man approached the officer at the intersection of Lenox Avenue and 112th Street and told him that a man dressed in a brown army jacket, walking with another man, west on 112th Street, had a gun. The officer followed defendant and his companion. Without a word, the officer threw his arms around defendant in a bear hug, telling him to get into a nearby hallway, where he felt an object at the area of the belt; lifted up defendant's jacket, uncovering a loaded .32 caliber revolver. Defendant was arrested; a subsequent search at the station house revealing syringes, hypodermic needles and a bottle cap with cotton alleged to contain heroin. The Court of Appeals, affirming on the opinion of the Appellate Term, rejected the People's contention that the officer, acting on information from an unknown citizen that a person was carrying a concealed weapon, acted reasonably in conducting a limited search. The search and seizure in *Bronk* was held to be more intrusive than a stop and frisk, the Appellate Term, observing in this connection: "The Fourth Amendment would have no meaning if any one could be seized in a bear hug in the street, without being asked a single question, merely on the strength of a story related to an officer by some unknown person, which, even if true, did not itself indicate exigent circumstances." *(People v Bronk, supra,* p 934.)

Similarly, in this case, the officers made no inquiry so as to connect defendant with any criminal activity. Officer Stryker seized defendant at gunpoint solely on the basis of his observation that Hernandez handed "something" to Chestnut. The majority concludes that the "something" was the gun. This may well be. However, the fruits of an unlawful search and seizure cannot justify either. The exchange, as observed, was equivocal. Without further explanation by Stryker as to what he had observed, it was just as reasonable to conclude that the "something" was money, a lighter, a cigarette or even a handshake. The equivocal acts did not justify the forcible seizure. The absence of any observation by Stryker as to what was handed by Hernandez to Chestnut compels the conclusion

that, as to Chestnut, the officers proceeded on no more than a vague or unparticularized hunch.

Nor may the propriety of the police conduct here be sustained as a stop and frisk, authorized by CPL 140.50 (subd 1), where the officer entertains a reasonable suspicion that a person has committed, is committing or is about to commit a felony or misdemeanor. (See *People v De Bour, supra,* p 223.) The court described the stop and frisk as the third level of police intrusive behavior: "A corollary of the statutory right to temporarily detain for questioning is the authority to frisk if the officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)." *(People v De Bour, supra,* p 223.) Here, however, the seizure of defendant cannot be justified as a stop and frisk. Although Stryker testified that Dieterich frisked both Hernandez and Chestnut, Dieterich testified otherwise— that he merely asked Chestnut where the gun was. When Dieterich was questioned as to why the arresting officers did not prepare a U.F. 250, he responded: "No, that is a stop and frisk. That wouldn't be made out in this case, it was an arrest made." When specifically asked whether this was a stop and frisk, he responded: "No." The court at the suppression hearing recognized the applicable standard, observing: "We are really talking about whether or not there was probable cause." Nevertheless, when the decision on the motion to suppress was rendered, insofar as Chestnut is concerned, the court found: "That leaves us with Chestnut. There was a right of the police to perform stop and frisk, having been aware of the fact of a robbery had been committed and a robbery being a form of violence. In a frisk, either or both of the individuals necessitated by the existing circumstances inherent in such a crime; and was permissible without preliminary questions."

I find error in the conclusion reached by the suppression court that the applicable standard to test the conduct of the police is that applicable to a stop and frisk. As testified by Officer Dieterich, this was an arrest, effected by a gunpoint seizure which clearly deprived defendant of his freedom of movement when he was physically restrained and directed to lie face down on the street (see *People v Cantor, supra).* The arrest was without probable cause. As observed in *People v De Bour (supra,* p 223), "a police officer may arrest and take into custody a person when he has probable cause to believe that

person has committed a crime, or offense in his presence (CPL 140.10)." That standard was not met here.

Nor may the stop be sustained merely because the weapon was eventually found on defendant's person. As the court observed in this connection in *People v Cantor* (36 NY2d 106, 111, *supra*), "we focus on the initial seizure of the defendant's person, noting, however, that if the initial stop of the defendant was unlawful the evidence thereafter acquired must be suppressed absent an independent establishment of probable cause." Here, there is no independent basis to establish that probable cause existed.

I perceive no reason to depart from the applicable standards for determining the propriety of police conduct as laid out in *People v Cantor (supra)* and *People v De Bour (supra)*. With respect to Chestnut, it is plain that the officers acted in reliance on suspicions only. There was nothing to link this defendant with any criminal activity, nor with Hernandez at the time Hernandez was observed at the phone booth at or about the time of the robbery. Defendant was seized later on because he was with Hernandez, a person the officers believed had been engaged in criminal activity. The mere fact that Chestnut was in the company of Hernandez did not furnish probable cause for defendant's arrest. (See *People v Martin,* 32 NY2d 123, *supra; People v Griffith,* 63 AD2d 138, *supra.*) Although the observation by Stryker that Hernandez handed "something" to defendant, may have justified an inquiry, it did not rise to the level of probable cause for arrest.

Even if the intrusion be viewed as merely a stop and frisk, the predicate did not warrant the extent of the intrusion. There was no testimony and no suggestion by either officer that either was apprehensive for his own safety. Particularly with respect to Chestnut such a finding was necessary to justify such a search (CPL 140.50, subd 3; *People v Prochilo,* 41 NY2d 759, 763; *People v Santiago,* 64 AD2d 355, 359, 361). We recognized in *People v Santiago (supra,* p 359): "As a corollary to the statutory right to detain, an officer also has the statutory authority to frisk if he reasonably suspects himself to be physically endangered. (CPL 140.50, subd 3.)" Here, the record does not furnish any basis to find that either officer feared for his own safety. Nor was there any testimony that either officer observed a bulge, outline or other objective evidence to support the conclusion that defendant had a gun. Chestnut's behavior was at the least innocuous and at worst

equivocal. According to the proof, he met Hernandez and walked with him through the courtyard. Without some proof of what Stryker observed being passed from Hernandez to Chestnut, it cannot be concluded, as did the officers, that Hernandez handed him the gun. A finding of probable cause to support an arrest requires much more. The observation of Justice SULLIVAN, writing for the majority in *People v Santiago (supra,* pp 360-361) is applicable with equal force here: "not only was each of his earlier acts consistent with innocent behavior, but we find that the entire sequence was devoid of any element of objective evidence to justify the officers' suspicions." We there held a search in conjunction with a stop to be unauthorized unless the officer reasonably suspected that he was in danger of physical harm. Here, we treat with an arrest, a higher level of police intrusion. The absence of such evidence is dispositive.

Nor are exigent circumstances present here to justify the manner in which defendant was seized. It cannot be gainsaid that the police function to prevent crime and preserve the public order invites prompt inquiry into unusual or suspicious activity, as recognized in *People v Rivera* (14 NY2d 441, 446): "If we recognize the authority of the police to stop a person and inquire concerning unusual street events we are required to recognize the hazards involved in this kind of public duty. The answer to the question propounded by the policeman may be a bullet; in any case the exposure to danger could be very great. We think the frisk is a reasonable and constitutionally permissible precaution to minimize that danger. We ought not, in deciding what is reasonable, close our eyes to the actualities of street dangers in performing this kind of public duty."

However, these cautions do not warrant the ultimate intrusion here undertaken. There must be "a balancing of the legitimate interests of the defendants against the reasonableness and appropriateness of the police action." *(People v Prochilo, supra,* p 761.) No reason appears why the officers, in seizing Hernandez, could not have isolated Chestnut against the fence for inquiry in the same manner as the woman who had been walking with them.

Moreover, since the gunpoint seizure of defendant constituted an arrest, defendant was entitled to appropriate *Miranda* warnings. It is undisputed that such warnings were not given until the officers took defendant back to the police

precinct. In the absence of *Miranda* warnings at the time of arrest, the question posed by Officer Dieterich when he asked defendant: "Where is the gun?" was improper. Accordingly, the response by defendant: "It's right here", pointing to his right-hand pocket and the gun found there by the officer should have been suppressed. Plainly, this inquiry, conducted at gunpoint while defendant was lying face down on the cement, was custodial interrogation.

Accordingly, the judgment, Supreme Court, New York County (COON, J., at suppression, plea and sentence), rendered September 6, 1977, convicting defendant on a plea of guilty to criminal possession of a weapon in the third degree (Penal Law, § 265.02) and imposing a sentence of five years' probation, should be reversed, on the law, the plea vacated, the motion to suppress granted and the indictment dismissed.

BIRNS, J. P., MARKEWICH and SILVERMAN, JJ., concur with SULLIVAN, J.; FEIN, J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on September 6, 1977, affirmed.