# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**322**

**KA 13-01489**

PRESENT: SMITH, J.P., PERADOTTO, LINDLEY, VALENTINO, AND WHALEN, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                  MEMORANDUM AND ORDER

DANIEL J. BURNETT, DEFENDANT-APPELLANT.

---

THE LEGAL AID BUREAU OF BUFFALO, INC., BUFFALO (ROBERT L. KEMP OF COUNSEL), FOR DEFENDANT-APPELLANT.

FRANK A. SEDITA, III, DISTRICT ATTORNEY, BUFFALO (NICHOLAS T. TEXIDO OF COUNSEL), FOR RESPONDENT.

---

Appeal from a judgment of the Supreme Court, Erie County (Penny M. Wolfgang, J.), rendered May 23, 2013. The judgment convicted defendant, upon his plea of guilty, of criminal possession of a weapon in the second degree.

It is hereby ORDERED that the judgment so appealed from is unanimously reversed on the law, the plea is vacated, those parts of the omnibus motion seeking to suppress physical evidence and statements are granted, the indictment is dismissed, and the matter is remitted to Supreme Court, Erie County, for proceedings pursuant to CPL 470.45.

Memorandum: On appeal from a judgment convicting him upon his plea of guilty of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]), defendant contends that Supreme Court erred in denying his motion to suppress physical evidence, i.e., a handgun, and his subsequent oral statements to the police because the police lacked reasonable suspicion to justify the search of his person. We agree.

According to the evidence presented at the suppression hearing, two police officers on routine patrol in the City of Buffalo received a 911 dispatch at approximately 5:45 p.m. that an unidentified caller reported that a man wearing blue jeans and a blue hoodie had displayed a gun to a woman on Brinkman Street. About 10 minutes later, the officers observed a man dressed in blue jeans and a blue hoodie walking down a street that is a little over a mile away from the Brinkman Street address. According to one of the officers, the man, later identified as defendant, was "staring" at their marked police vehicle. The officers drove up next to defendant and requested identification. Defendant retrieved his identification from the pocket of his jeans and handed it to the officers. The officers

returned defendant's identification, and he began to walk away. The police followed defendant in the patrol vehicle and again pulled up next to him. Defendant's left hand was in the left pocket of his pants. One of the officers exited the patrol car, grabbed defendant's left hand inside of his jeans pocket, and felt what he believed to be a handgun. After several unsuccessful attempts to retrieve the object from defendant's pocket, defendant yelled "the gun's in my pajama pants." Defendant was wearing pajama pants underneath his jeans. The officer removed the gun from the pocket of defendant's pajama pants and placed him under arrest.

It is well established that, in evaluating the legality of police conduct, we "must determine whether the action taken was justified in its inception and at every subsequent stage of the encounter" (*People v Nicodemus*, 247 AD2d 833, 835, *lv denied* 92 NY2d 858, citing *People v De Bour*, 40 NY2d 210, 215). In *De Bour*, the Court of Appeals "set forth a graduated four-level test for evaluating street encounters initiated by the police: level one permits a police officer to request information from an individual and merely requires that the request be supported by an objective, credible reason, not necessarily indicative of criminality; level two, the common-law right of inquiry, permits a somewhat greater intrusion and requires a founded suspicion that criminal activity is afoot; level three authorizes an officer to forcibly stop and detain an individual, and requires a reasonable suspicion that the particular individual was involved in a felony or misdemeanor; [and] level four, arrest, requires probable cause to believe that the person to be arrested has committed a crime" (*People v Moore*, 6 NY3d 496, 498-499).

Here, contrary to defendant's contention, we conclude that the information provided in the 911 dispatch coupled with the officers' observations provided the police with "an objective, credible reason for initially approaching defendant and requesting information from him" (*People v Hill*, 302 AD2d 958, 959, *lv denied* 100 NY2d 539; *see People v Crisler*, 81 AD3d 1308, 1309, *lv denied* 17 NY3d 793). The officers pulled up next to defendant and, without exiting the vehicle, asked to see defendant's identification and asked defendant where he was going and where he was coming from, which was a permissible level one intrusion (*see People v McIntosh*, 96 NY2d 521, 525; *People v Hollman*, 79 NY2d 181, 185; *People v Rodriguez*, 82 AD3d 1614, 1615, *lv denied* 17 NY3d 800).

Contrary to the further contention of defendant, we conclude that his failure to answer the officers' questions about where he was going and where he was coming from, when added to the information acquired from the police dispatch and defendant's heightened interest in the patrol car, created a "founded suspicion that criminality [was] afoot," justifying a level two intrusion (*Hollman*, 79 NY2d at 185; *see Moore*, 6 NY3d at 500; *People v Glover*, 87 AD3d 1384, 1384, *lv denied* 19 NY3d 960; *People v Robinson*, 278 AD2d 808, 808-809, *lv denied* 96 NY2d 787). The common-law right of inquiry "authorized the police to ask questions of defendant—*and to follow defendant while attempting to engage him*—but not to seize him in order to do so" (*Moore*, 6 NY3d at 500 [emphasis added]). The police therefore acted lawfully in

following defendant for the purpose of obtaining an answer to their valid questions about his whereabouts. The encounter, however, quickly escalated to a level three intrusion when one of the officers grabbed defendant's hand and patted the outside of his pants pocket. "[A] stop and frisk is a more obtrusive procedure than a mere request for information or a stop invoking the common-law right of inquiry, and as such normally must be founded on a reasonable suspicion that the particular person has committed or is about to commit a crime" (*People v Benjamin*, 51 NY2d 267, 270). " '[W]here no more than a common-law right to inquire exists, a frisk must be based upon a reasonable suspicion that the officers are in physical danger and that defendant poses a threat to their safety' " (*People v Stevenson*, 273 AD2d 826, 827; *see Robinson*, 278 AD2d at 808; *see generally People v Lopez*, 71 AD3d 1518, 1519, *lv denied* 15 NY3d 753). Here, the People do not contend that the police had reasonable suspicion that defendant had committed or was about to commit a crime at the time of the frisk, and we agree with defendant that reasonable suspicion did not exist (*see People v Holmes*, 81 NY2d 1056, 1057-1058). Rather, the sole justification proffered for the officer's conduct was that he feared for his safety (*see People v Salaman*, 71 NY2d 869, 870). We thus must determine "whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger" (*Terry v Ohio*, 392 US 1, 27). In making that determination, we must give "due weight . . . , not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he [or she] is entitled to draw from the facts in light of his [or her] experience" (*id.; see People v Batista*, 88 NY2d 650, 653-654; *People v Russ*, 61 NY2d 693, 695). The fact that defendant's hand was in his pocket does not, standing alone, "provid[e] a reasonable basis for suspecting that [defendant] [was] armed and may [have been] dangerous" (*Russ*, 61 NY2d at 695; *see People v Santiago*, 64 AD2d 355, 361; *see also People v Gray*, 154 AD2d 301, 303). A jeans pocket, unlike a waistband or even a jacket pocket, is not "a common sanctuary for weapons" (*People v Canady*, 261 AD2d 631, 632, *lv dismissed* 93 NY2d 967, *reconsideration denied* 93 NY2d 1015; *see Holmes*, 81 NY2d at 1058; *De Bour*, 40 NY2d at 221). Moreover, unlike in other cases where we have sanctioned a frisk for weapons, there was no evidence in this case that defendant refused to comply with the officers' directives or that he made any furtive, suspicious, or threatening movements (*see e.g. People v Carter*, 109 AD3d 1188, 1189, *lv denied* 22 NY3d 1087; *People v Fagan*, 98 AD3d 1270, 1271, *lv denied* 20 NY3d 1061, *cert denied* ___ US ___, 134 S Ct 262; *Glover*, 87 AD3d at 1384-1385; *cf. People v Sims*, 106 AD3d 1473, 1474, *appeal dismissed* 22 NY3d 992). Indeed, under the circumstances of this case, the presence of defendant's hand in his left pants pocket was particularly innocuous and " 'readily susceptible of an innocent interpretation' " (*People v Riddick*, 70 AD3d 1421, 1422, *lv denied* 14 NY3d 844; *see People v Brannon*, 16 NY3d 596, 602). Defendant retrieved his identification from his left pants pocket and returned it to that pocket after complying with the officers' request to produce identification (*cf. Sims*, 106 AD3d at 1473-1474).

We therefore conclude that, "[b]ecause the officer lacked

reasonable suspicion that defendant was committing a crime and had no reasonable basis to suspect that he was in danger of physical injury, . . . the ensuing pat frisk of defendant was unlawful" (*People v Mobley*, 120 AD3d 916, 918; *see Stevenson*, 273 AD2d at 827; *Canady*, 261 AD2d at 632).  We therefore reverse the judgment, vacate the plea, grant those parts of defendant's omnibus motion seeking to suppress the handgun seized from his person and his subsequent oral statements to the police, dismiss the indictment, and remit the matter to Supreme Court for proceedings pursuant to CPL 470.45.

Entered:  March 27, 2015                          Frances E. Cafarell
                                                  Clerk of the Court