OPINION OF THE COURT
Donald J. Sullivan, J.
The court conducted an extensive Mapp suppression hearing to determine the admissibility of a gun discovered by a court officer during a body search of defendant (GPL 710.20; Mapp v Ohio, 367 US 643). The People produced eight witnesses, namely uniformed court officers David Adler and Paul Villanueva, Assistant District Attorney Deirdre Thurber, borough chief clerk (of the Bronx Criminal Court) Joseph Carney, Detective Charles Wells, Office of Court Administration analyst Robert Swift, senior court officer Ralph Edwards and Captain James Jackson. Defendant called no witnesses on his behalf. The findings of fact that follow are essentially uncontroverted.
Court officers David Adler and Paul Villanueva and Assistant District Attorney Deirdre Thurber testified substantially the same, namely that on March 12, 1978, at or about 7:00 p.m., the defendant entered the arraignment part — Courtroom AR3 — Bronx County Criminal Court, in the company of four others carrying a large attaché case (bag); that in said courtroom there were also approximately 60 other spectators, a number of whom were carrying bags; that they recognized the defendant having seen him on prior occasions during court proceedings and community demonstrations; that based on newspaper articles and observations, they believed him to be an activist and terrorist and member of the F.A.L.N. (a so-called Puerto Rican liberation group); that they came to the conclusion that the attaché case may contain a bomb; that a recess was declared for the purpose of inspecting it; that court officer Adler approached defendant in the hall of the courthouse requesting permission to search the bag and when *1097 defendant refused said permission, placed him under arrest; that court officer Adler indicated that he believed that he had the authority to compel a person to submit to a search of an attaché case; that the individual’s failure to comply constituted a violation for which he could be arrested; that pursuant to a body search of the defendant, a defaced, .38-caliber revolver with holster and cartridges, which is the subject of this hearing, was discovered in and about defendant’s waistband.
The chief clerk, Joseph Carney, indicated that the courthouse had been the recipient of anonymous bomb threats in the past; that he gave oral instructions regarding the routine inspections of packages brought into the building and examination of suspicious bulges on persons entering the building; that there were posted signs at the entranceway indicating "all persons entering this building are subject to search”; that, since the subject incident occurred on a weekend, the responsibility of administrative searches devolved upon the court officers in the arraignment parts as the entranceway was not manned; that similar afore-mentioned signs were posted on the courtroom doors; that no specific instructions were issued to court officers in the event a visitor refused to be searched, but it was his understanding that if the visitor refused to be searched he would be permitted to leave the building.
The testimonies of Bomb Squad Detective Charles Wells, Police Captain James Jackson, senior court officer Ralph Edwards and Office of Court Administration analyst Robert Swift provided statistical details of the numerous records of bomb hoaxes, bomb explosions, assaults and possession of dangerous weapons in the national, State and city courthouses. The court will and does take notice of these statistics and of the substantial need to take the most stringent safety and security precautions in courthouses. It is clear that such measures are required for the protection of the Judges, court personnel, attorneys, defendants and visitors, as well as to prevent damage to the structures itself.
The central issues presented are two-fold: (1) Was there probable cause to arrest the defendant stemming from his refusal to permit a courthouse search of his attaché case? (2) Was the warrantless courthouse arrest, search incident thereto and seizure of defendant’s gun justified on the basis of either defendant’s implicit assent or exigent circumstances? *1098 Stated another way, does a courthouse visitor shed his constitutional rights at the courthouse gate? (See Tinker v Des Moines School Dist., 393 US 503, 506.)
The court does not believe that a citizen merely by entering the hallowed portals of a courthouse is per se deprived of his constitutional rights against unreasonable searches and seizures. Moreover, under the particular facts and circumstances in this case, the court is constrained to conclude that the warrantless arrest, the ensuing search incident thereto and seizure of the weapon lacked probable cause, voluntary consent and exigent circumstances, jeopardizing defendant’s constitutional rights to be free from an unreasonable arrest, search and seizure guaranteed by the Federal and State Constitutions (US Const, 4th Amdt; NY Const, art I, § 12).
CONCLUSIONS OF LAW
At the outset, it is axiomatic that the Fourth Amendment proscribes the arrest of an individual without Magistrate authorized warrant or the existence of probable cause (Dunaway v New York, 442 US 200; People v Oden, 36 NY2d 382; Coolidge v New Hampshire, 403 US 443; People v Darden, 34 NY2d 177). The statutes authorizing arrests without warrants are found in CPL article 140. A police officer (CPL 140.10) and peace officer (CPL 140.25) are authorized to arrest a person without a warrant when they have "reasonable cause to believe that such person has committed” a crime. A uniformed court officer is included within the definition of "peace officer” under CPL 1.20 (subd 33). Reasonable or "[pjrobable cause is the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers. [Citations omitted.] In dealing with probable cause, we deal with probabilities; these are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. (See Brinegar v. United States, 338 U.S. 160, 175.)” (People v Tolentino, 40 AD2d 596-597.) A probable cause arrest exists when "the facts and circumstances within their [the arresting officer’s] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that” a crime has been or is being committed by the arrestee (Carroll v United States, 267 US 132, 162; Draper v United States, 358 US 307). The probable cause *1099 requirement, devised by the framers of our Constitution, "represented the accumulated wisdom of precedent and experience as to the minimum justification necessary to make the kind of intrusion involved in an arrest 'reasonable’ under the Fourth Amendment” (Dunaway v New York, 442 US 200, 208, supra). The determination rests upon an assessment of "all the facts and circumstances” of each case (People v Kreichman, 37 NY2d 693, 699). Of course, the burden of going forward in the first instance to show the existence of probable cause rests with the People, albeit the ultimate burden of establishing the illegality of the arrest or seizure falls upon the defendant (People v Malinsky, 15 NY2d 86; People v Whitehurst, 25 NY2d 389; Nardone v United States, 308 US 338). Mere suspicion or equivocal behavior susceptible to interpretation of innocent conduct or the refusal to comply with a request to search either alone or in combination with the arresting officer's knowledge of a defendant’s general reputation, does not normally reach the level of probable cause (People v De Bour, 40 NY2d 210, 216; People v Yedvobnik, 48 NY2d 910 [bookmaker reputation]; United States v McCaleb, 552 F2d 717; see People v Elwell, 50 NY2d 231). As stated in People v Elwell (supra, p 236) the purpose of the stringent probable cause standards provided in the Fourth Amendment of the Federal Constitution and the comparable State Constitution (NY Const, art I, § 12) "is protection of innocent and guilty alike from search or arrest based upon suspicion or upon common rumor and report rather than upon proof of reasonable grounds for believing a crime to have been committed, either through direct evidence or through reasonable inferences from suspicious acts * * * 'Arrest on mere suspicion collides violently with the basic human right of liberty.’ ”
The record before the court in the case at bar discloses the following list of factors relied upon by the People, which essentially provided the stimulus for the initial stop, culminating in the arrest and discovery of the weapon during the search incident thereto: (1) defendant’s reputation as a reputed member of the F.A.L.N., an alleged terrorist-type organization; (2) his entry into the courtroom with a large attaché case; (3) awareness of defendant’s previous arrest for possession of weapons; (4) knowledge of defendant as a person who allegedly led prior demonstrations in the courthouse; (5) observations of defendant sitting in the back row of seats, whereas *1100 on previous occasions, he usually sat in the front row; (6) defendant’s late hour of arrival; (7) defendant, upon entry, was in the company of four other individuals and for the first time was seen carrying an attaché case in the courtroom; (8) defendant was seen holding the attaché case cradled on his lap in an alleged unusual manner, rather than placing it on the floor; and (9) knowledge that defendant had on a prior occasion threatened an Assistant District Attorney with physical injury for which he apologized to the prosecutor in the chambers of a Judge. The court concludes that the enumerated facts alone, or in combination, did not constitute probable cause to arrest defendant as it did not "warrant a man of reasonable caution” to believe that defendant was committing or had committed a crime, to wit, possession of a bomb in his attaché case (Brinegar v United States, 338 US 160, supra; see, also, Draper v United States, 358 US 307, supra; Terry v Ohio, 392 US 1). Since the pretext arrest was illegal (Davis v Mississippi, 394 US 721), the weapon discovered on his person must be suppressed as the "fruit of the poisonous tree” (Wong Sun v United States, 371 US 471; Brown v Illinois, 422 US 590), unless there exists some other constitutional exception to the warrantless search and seizure.
The prosecution maintains that the sequence of events occurring within a courthouse environs, fit two judicially recognized exceptions. They justify the search of the defendant under the doctrine of implied consent and "exigent circumstances”. On the issue of a consensual search, it is the People’s contention that a visitor merely by entering a courthouse building and remaining in a courtroom, in which there are conspicuously posted and visible signs warning that all persons entering the building and courtroom are subject to search, tacitly assented to a search by court officials. Infringement of the constitutional protection of the Fourth Amendment must be analyzed within the framework of reasonableness considering "(i) the public interest served by the seizure, (ii) the nature and scope of the intrusion, and (iii) the objective facts upon which the law enforcement officer relied in light of his knowledge and expertise” (United States v Mendenhall, 446 US 544). The reasonableness of the security measures promulgated by the State involves a "balancing [of] the need to search against the invasion which the search entails” (Camara v Municipal Ct., 387 US 523, 537).
To overcome the fundamental tenet of the Fourth Amend *1101 ment that a warrantless and nonprobable cause search is "per se unreasonable”, the courts have fashioned a "few specifically established and well-delineated exceptions” that do not violate the guarantees (Katz v United States, 389 US 347, 357; Coolidge v New Hampshire, 403 US 443, supra; Chambers v Maroney, 399 US 42). One of the recognized exceptions is a "voluntary consent” search (People v Hodge, 44 NY2d 553; People v Singleteary, 35 NY2d 528; Zap v United States, 328 US 624). In other words, a State sponsored search conducted pursuant to consent, in lieu of obtaining a warrant or meeting probable cause requirements satisfies constitutional prescriptions (People v Hodge, supra). The People understandably have a heavy burden of establishing a valid consent, i.e., a search "freely and voluntarily given” by defendant (Bumper v North Carolina, 391 US 543; People v Whitehurst, 25 NY2d 389, supra; People v Kuhn, 33 NY2d 203). Determination of the voluntariness of the consent is a matter of assessing the "totality of all the circumstances” (Schneckloth v Bustamonte, 412 US 218; People v Gonzalez, 39 NY2d 122). The availability of this concept requires an unequivocal and specific consent, verbal or by conduct (Judd v United States, 190 F2d 649). Implied consent presupposes one had, verbally or by conduct, freely acquiesced and chose to permit an inspection immediately upon entry and remaining in the courthouse proper. Constitutional rights are assiduously safeguarded to insure that the choice was intelligently and knowingly made. An effective waiver, by consent, of the constitutional guarantee against an unreasonable search and seizure evidences "an intentional relinquishment or abandonment of a known right or privilege” (Johnson v Zerbst, 304 US 458, 464). This is in accord with the well-settled presumption against consent or waiver of a defendant’s Fourth Amendment rights (Villano v United States, 310 F2d 680; People v Cohen, 42 Misc 2d 403, mod on other grounds 24 AD2d 900, affd 18 NY2d 650).
Concededly, what is a reasonable search in a courthouse may be impermissible in the context of other facilities. This is true because the courts have recognized the diminishment of the citizen’s expectation of privacy upon entrance into a courthouse facility arising out of the legitimate State interests and attendant exigencies (Downing v Kunzig, 454 F2d 1230; McMorris v Alioto, 567 F2d 897). The application of the doctrine of implied consent to sustain an otherwise unlawful search or seizure has been sparingly adopted by the courts (cf. *1102 United States v Davis, 482 F2d 893). Its utilization has been generally confined to facilities offering limited and restricted access to the general public (see, e.g., United States v Fox, 407 F Supp 857 [Air Force base]; United States v Ellis, 547 F2d 863 [military installations]; United States v Sihler, 562 F2d 349 [prison]; Adderley v Florida, 385 US 39 [prison]; United States v Brignoni-Ponce, 422 US 873 [border patrol]). Yet, even in such instances, implied consent is not a substitute for reasonableness in the absence of a rational objective criteria for a legitimate search and seizure within the context of the State and Federal Constitutions (see Piazzola v Watkins, 442 F2d 284 [college dorm]). To permit the search in this case, anchored upon the thread of implied consent, would unravel the constitutional protection beyond tolerable limits. What is contemplated is an inference of a voluntary consent secured during a measured, deliberate, "well-administered” and defined stop and search system (United States v Lopez, 328 F Supp 1077; cf. United States v Mendenhall, 446 US 544, supra; United States v Davis, 482 F2d 893, supra). The theory, when found acceptable, offers the citizen a choice negating compulsion to submit (McMorris v Alioto, 567 F2d 897, supra).
To allow uninterrupted access into a courthouse and courtroom and then expose the visitor to an arbitrary search at the unbridled discretion of a court officer is a violation of his Fourth Amendment rights. The courts have struck down as unreasonable any purported consent to search solely upon entrance to a hospital facility which attempted to base the authority of the search upon posted signs (Chenkin v Bellevue Hosp. Center, 479 F Supp 207). The court reasoned that to validate a search by implied consent through the posting of signs would be tantamount to invasion of guaranteed Fourth Amendment rights by proclamation. As declared in Gaioni v Folmar (460 F Supp 10, 14), the State "cannot condition public access to the [municipally owned] Civic Center on submission to a search and then claim those subjected to the searches voluntarily consented.” Generally, the well-developed screening programs validated searches only if recognizing the right of the person to avoid the search by electing not to seek access (United States v Davis, 482 F2d 893, supra). In Davis, the court held that implied consent may be demonstrated when (p 914) "the alternatives presented to a potential passenger approaching the screening area are so self-evident that his *1103 election to attempt to board [the airplane] necessarily manifests acquiescence in the initiation of the screening process”. Here, the circumstances did not reflect the availability of effective alternative choices. There were no guards or court officers manning the entrance to the building or courtroom which clearly apprised visitors of a screening procedure. The absence of permanent, official search stations enabling a visitor to observe other persons being stopped and searched; and that upon refusal denied admission, tends to vitiate a finding of implied consent in this case. There is no doubt of the public necessity for instituting security and safety measures in courthouses. The record is replete with and this court takes judicial notice of the instances of the violence, bombings and bomb threats directed toward the nationwide courts and in particular, the State court system. However, the manner in which the procedures were carried out in the case at bar showed a lack of proficiency and expertise. The ostensible purpose for conducting searches was to prevent the carrying in of weapons, explosives and other contraband into the courthouses. The accomplishment of its purpose by the at random, arbitrary system devised in this case has not been adequately proved. Moreover, the nature and degree of the search procedures were unreasonable in the absence of any alternative choices given to the courthouse visitor. To adopt the People’s argument regarding implied consent would embrace the notion that by the sole expedient of conspiciously displaying warning signs in open, visible view deprives all courthouse visitors of their reasonable, though somewhat restricted, expectation of privacy against governmental invasion. The procedures prevailing in the instant case, unsupported by "specially trained agents [acting] pursuant to a well-planned, and effective * * * law enforcement program” (United States v Mendenhall, 446 US 544, supra), is an insufficient basis to infer a visitor’s consent to a wholesale, arbitrary search and seizure.
To pass constitutional muster, for example, a "well-planned” screening system, employing some metal detection apparatus, should uniformly and indiscriminately monitor all persons seeking entrance to the courthouse either at the entranceway or at the courtroom doors, or both; should grant opportunity to the visitor to refuse the search and then be denied access upon refusal; or in conjunction, should provide a system for checking the visitor’s possessions and property with *1104 the court officials; and should disseminate scientifically, professionally drawn search guidelines to the court personnel and public.
Accordingly, the court finds, upon assessment of all the facts and circumstances, that the People have failed to meet their heavy burden of establishing defendant’s voluntary consent to the search.
Now having determined the absence of both probable cause to arrest and implied consent to the warrantless search and seizure of defendant, we next focus on the area of law involving "reasonable suspicion” and "exigent” circumstances. The People assert the courtroom search was limited in scope and justified on the ground that it was a self-protective search by a court officer who reasonably suspected the defendant was armed and dangerous. As one of the exceptions to the warrant and probable cause requirements the Fourth Amendment, there has been recognized the emergency seizure of a citizen, short of an arrest, on less than probable cause. Justification for such action is the "necessity of protecting the safety of the officer and preventing potential escape [of arrestee] or destruction of evidence” (People v Evans, 43 NY2d 160, 166; People v Vidal, 71 AD2d 962), as well as to "dispel his reasonable fear for * * * others’ safety” (Terry v Ohio, 392 US 1, 30, supra). The rationale requires the court "to examine the predicate for the police action and then determine whether or not that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct” (People v Stewart, 41 NY2d 65, 66). In People v De Bour and People v LaPene (40 NY2d 210, supra) the Court of Appeals enunciated a standard of permissible police conduct when engaged in a street encounter with a citizen. A three-tiered standard of reasonable police conduct was adopted to determine not only that the police action was (p 215) "justified [in] its inception” but "whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible”. The gradations of permissible intrusive police action embraces a rule of reasonableness in public place encounters that ( p 223) "directly correlates the degree of objectively credible belief with the permissible scope of interference”. The rules have parallel application to courthouse searches. The first stage is a minimal intrusion to request information. " '[A] police officer, in the absence of any concrete indication of criminality, may *1105 approach a private citizen on the street for the purpose of requesting information’ if he has 'some articulable reason sufficient to justify the * * * action’. (People v De Bour, 40 NY2d 210, 213.) 'The basis for this inquiry need not rest on any indication of criminal activity on the part of the person of whom the inquiry is made’. (De Bour, supra, p 213.) The stop must not be 'the product of mere whim, caprice or idle curiosity.’ (People v Ingle, 36 NY2d 413, 420.)” (People v Santiago, 64 AD2d 355, 359.) Continuing its analysis of the De Bour pronouncements, the Santiago court states (at p 359), "[t]he second, and more intense level of intrusion is the police officer’s common-law right to inquire. This stage 'is activated by a founded suspicion that criminal activity is afoot’ (People v De Bour, 40 NY2d 210, 223, supra) and carries with it the right to interfere with a citizen to the extent necessary, short of a forcible seizure, to obtain an explanation. (People v De Bour, supra, p 223; People v Cantor, 36 NY2d 106, 114.) The third level * * * encompasses the statutory right provided by CPL 140.50 (subd 1) authorizing a forcible stop and detention of a person when a police officer [or court officer — CPL 140.50 (subd 2)] entertains a reasonable suspicion that the person has committed, is committing, or is about to commit a felony or misdemeanor. As a corollary to the statutory right to detain, an officer also has the statutory authority to frisk if he reasonably suspects himself to be physically endangered. (CPL 140.50, subd 3.)” (Emphasis supplied.) In viewing the initial stop of the defendant wherein the court officer requested permission to search the contents of defendant’s attaché case, there appears to be no constitutional objection. The officer’s approach may be sustained on any of several theories: (1) under the first level not necessarily indicative of criminal activity; (2) on founded suspicion "that criminal activity may be afoot” (Terry v Ohio, 392 US 1, supra); or (3) inherent authority of State judicial officials to adopt reasonable administrative regulations governing the search of visitors seeking access to the courthouse (United States v Davis, 482 F2d 893, supra). The search, however, "must be clearly necessary to secure a vital governmental interest such as [State courthouses] from a real danger of violence. [Citations omitted.] The search must be limited and no more intrusive than necessary to protect against the danger to be avoided, but nevertheless reasonably effective to discover the material sought. The inspection must be conducted for a purpose other than the gathering of evidence for criminal prosecutions.” *1106 (McMorris v Alioto, 567 F2d 897, 899, supra.) In this case, the court finds, from the review of the record, a legitimate State interest to safeguard the health, welfare and safety of the general public, judiciary, court personnel, attorneys and litigants. The court is satisfied that the need for the regulatory search was established. However, the authority, implemented by the conspicuously displayed "subject to search” signs in the courthouse, warranted at best a minimal initial request for permission to search.
The court’s next inquiry is to determine whether the ensuing warrantless frisk or search was justified because the "exigencies of the situation made that course imperative” (Matter of Kwok T., 43 NY2d 213, 220). A Terry emergency frisk is permissible where the officer has reason to believe that the persons with whom he is dealing may be armed and presently dangerous. Under the statutory provision, the self-protective search is available if the police officer or court officer, after stopping a person in or about the courtroom, "reasonably suspects that he is in danger of physical injury” (CPL 140.50, subd 3). The codified stop and frisk authority engendered by the Terry, Sibron and Adams trilogy (Terry v Ohio, 392 US 1, supra; Sibron v New York, 392 US 40; Adams v Williams, 407 US 143) underscores the "reasonable suspicion” test validating a self-protective frisk or search. The officer should in the same manner as making a stop, "indicate specific and articulable facts which, along with any logical deductions, reasonably prompted that intrusion. Vague or unparticularized hunches will not suffice” (People v Cantor, 36 NY2d 106, 113, supra). Neither "gut reaction” (People v Sobotker, 43 NY2d 559, 564) nor "a sincere, good faith belief by police officers that a crime is about to be committed, without objective evidence of criminal activity” (People v Santiago, 64 AD2d 355, 360, supra, citing Terry v Ohio, supra; People v Sobotker, supra; People v Cantor, supra) will serve as a predicate for the search. An "emergency” type frisk or search premised on mere belief by a police or court officer that he was confronted with a dangerous or armed person is offensive to a citizen’s Fourth Amendment guarantees and expectation of privacy rights however limited they may be in a courthouse atmosphere. To justify such conduct, the sovereign must not only show that its agent believed "his safety or that of others [was] in danger” (United States v Brignoni-Ponce, 422 US 873, 880, supra; Terry v Ohio, supra) but that *1107 in fact the agent had reasonable suspicion for such belief. Otherwise, we would be involved with the creation of illusory rights — a result not intended by the Constitution, nor to be countenanced by the court.
The question thus facing the court is whether, from an objective point of view, the court officer in this case had a reasonable basis to suspect that the defendant was concealing a bomb in his attaché case. The record, in the opinion of this court, does not sustain the People’s position. Examination of each of the factors which the People presented independently and in confluence with each other, did not reach that quantum of knowledge "sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe” that a bomb was in defendant’s possession (People v Cantor, 36 NY2d 106, 113, supra; see La Fave "Street Encounters” and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich L Rev 39). Admittedly, the triggering mechanism sparking the search by court officer Adler, other than his perception of defendant’s reputation, was the observation of the attaché case in defendant’s possession when he entered the courtroom. Defendant was not engaged in any obvious or covert criminal activity. He was not violating any court rules or regulations, nor acting boisterously or causing any disturbance in the courtroom. No exposed wires were seen or sound of metallic objects heard or bulges observed in or around the attaché case. There were no recent bomb threats calling for extraordinary precautions. The record reveals that court officer Adler had a good faith, intuitive suspicion, concurred in by his colleague, court officer Villanueva, and Assistant District Attorney Thurber concerning defendant’s connection to the F.A.L.N. — the so-called terrorist organization. Yet, the record does not offer a valid basis from which such fact may be inferred (cf. Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410). While each law enforcement official may be presumed to know information common to all (Giglio v United States, 405 US 150), there was no reliable direct source of information substantiating the information which led to their suspicious feelings. Their collective knowledge was spun not from fabric of provable facts but from the gossamer of hearsay, gossip and unverifiable newspaper reports. Even assuming defendant’s membership in that organization, none of the People’s witnesses testified, for example, that he was an explosives expert or dealt in explosives or was arrested or *1108 convicted for dealing in such contraband or was in charge of adminstering such weaponry on behalf of the organization (see Rice v Wolff, 388 F Supp 185, affd 513 F2d 1280). The sum total of events preceding the request to search defendant’s attaché case was an insufficient catalyst to vest the court officer with reasonable grounds to arrest or make an immediate frisk of defendant or his possessions (see Warden v Hayden, 387 US 294; Chimel v California, 395 US 752; also Lo-Ji Sales v New York, 442 US 319). Defendant’s entrance into the courtroom with four companions at the allegedly late hour of the evening, sitting in the rear of the courtroom and holding the attaché case in an "unusual” manner, and refusing to grant permission to search, did not reach that level of probable cause to arrest or that the court officer had reasonable suspicion to believe that he and others were in immediate danger. Coupling defendant’s reputation to the other described factors did not elevate the observable conduct of defendant from one of mere suspicion to reasonable belief that defendant was armed or dangerous (People v Posnjak, 72 AD2d 966; Rice v Wolff, supra). On the contrary, it was highly unlikely that a "bomber” would retain an explosive device cradled on his lap in full view of court personnel and with other friends in close proximity. Thus, there was no articulable foundation on which to deduce from an objective point of view that the court officer could reasonably believe, under the totality of circumstances, that there was a bomb in defendant’s suitcase posing an immediate danger to himself and others. Therefore, the seizure of the gun must be suppressed as the "fruits of the poisonous tree” (Wong Sun v United States, 371 US 471, supra) absent attenuation by independent sources (Brown v Illinois, 422 US 590, supra). In this case, the discovery of a weapon would not remove the taint of the primary illegal search and seizure (notably, not a bomb, but only papers and documents, were discovered in the attaché case). In any event, "a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success” (United States v Di Re, 332 US 581, 595; Beck v Ohio, 379 US 89; People v Rizzo, 40 NY2d 425, 429).
In short, under all the facts and circumstances adduced here, the court officer’s warrantless stop and request to search was justified in its inception. The predicate which rendered the original intrusion was, as herein indicated, sustainable *1109 under several theories. But the subsequent arrest and search lacking probable cause or other recognized exception were unreasonable because of its overbroad scope and intensity. The court finds that the arresting court officer should not have reasonably concluded that the suspect possessed items which posed an immediate danger to the court officer and those nearby. The court is not unaware of the holding in Brown v Texas (443 US 47), which took cognizance of the expertise of a police officer. In assessing criminal conduct an indication of reliability was given to "the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer” (supra, p 52, n 2; see, also, People v Charles J., 73 AD2d 322, 327). This principle may cut both ways. An experienced law enforcement official should be in a better position to avoid unjustifiable intrusions in violation of constitutional limitations solely on suspicious behavior. In other words, "an officer because of his training and experience may be held to have probable cause when a layman confronted with the same facts would not; or he may for this reason not be entitled to mistakes which would be reasonable for a layman, and thus not have probable cause. In any event, a standard does not become subjective rather than objective merely because it takes into account the special skills and knowledge of the actor” (La Pave "Street Encounters” and the Constitution: Terry, Sibron, Peters and Beyond, 67 Mich L Rev 39, 71).
In this vein, the court would note that a recent United States Supreme Court decision upheld the brief stopping of an airport passenger who matched the "drug courier profile” (United States v Mendenhall, 446 US 544, supra, decided May 27, 1980, by a 5 to 4 vote). It was observed that such profile (that is, a set of behavorial characteristics "generally associated with narcotics traffickers”) was developed and implemented by (p —, p 3133) "specially trained agents act-ting] pursuant to a well-planned, and effective, federal law enforcement program”. Mr. Justice Powell, speaking for a divided majority, held that the "profile” afforded the Federal agents reasonable suspicion to believe that the defendant was engaging in criminal activity sufficient for a stopping of the person for routine questioning. But Mr. Justice Powell moderated his remarks by commenting that reliance upon the "drug courier profile” would not necessarily demonstrate rea *1110 sonable suspicion as (p —, n 6, p 3133, n 6) "[ejach case raising a Fourth Amendment issue must be judged on its own facts”. The Supreme Court majority concluded that the search following the investigative questioning was justified by the voluntary consent of the searchee. Mendenhall thus teaches us that at best a "profile”, alone, may establish good cause for an investigative stop of a suspicious individual but not necessarily permit a search without more compelling evidence or voluntary consent. The case here is clearly distinguishable on its facts from Mendenhall. Absent was any sort of "courthouse profile” let alone one designed and developed as part of a "well-planned and effective enforcement” program. Whether a future, professionally developed "courthouse profile”, by itself, would provide reasonable suspicion to stop is not certain. A determination of a permissible investigative stop, short of a forcible seizure or search, would probably have to be made on an ad hoc basis. In any event, a valid constitutional stop whether supported by a "courthouse or drug courier, or antihijack profile” or other reasonable predicate, may not generally serve as the triggering mechanisms for more extended intrusions. A further search will usually require consent, probable cause or emergency circumstances (Dunaway v New York, 442 US 200, supra).
This decision is in no way intended to denigrate the legitimate State policy considerations in the imposition of security measures in State courthouses, nor impugn or criticize the good faith, alert actions of the court officer, in concert with the other officials, undertaken in this case. It does reflect the court’s exhaustive research of the applicable law and consideration of the articulate, well-documented memoranda of law submitted by opposing counsel and amicus curiae, for which the court expresses its appreciation. In People v Munoz (40 AD2d 337, 338, affd 33 NY2d 998), the Appellate Division cogently observed "[i]t is the function of this court to construe, apply and enforce the law as it exists and as settled by precedents of higher courts, even though the result reached may not meet with popular approval, nor even our own approval. Therefore, although the conclusion reached by the dissent might be a desirable one from the view of law enforcement, the fact is that we cannot make our own rules as cases come along. Until a change in the law is made by the higher courts, we are bound by the law as it exists now, and if it results in guilty persons escaping punishment, that is unfortu *1111 note, but, beyond our power to remedy, unless we were to treat binding precedents with disdain.”
Accordingly, defendant’s motion to suppress the evidence of the weapon is granted.